328, Old Reliable Wholesale v. Cornell Corporation. Mr. Baum? Thank you, your honor. May it please the court, I have two pieces of art I have to deal with, the VT2 and the Airflow product, and I'll start with the VT2. It's ORW's contention that the district court erred in finding that the VT2 anticipated the claims of the 950 patent, in particular claim 1, the only independent claim, because what the district court found was that it anticipated, even though there was an intervening layer of OSB, or wood if you will, oriented strand board between the blocks and the insulating material. You agree that there has to be some kind of intervening layer, right? That the foam has to be applied to some sort of layer. If you're using polyisocyanurate foam, yes, but there are other foams that are mentioned in the patent, extruded polystyrene for example, where it doesn't require a facer, another layer, essentially a thin piece of fiberglass or felt to maintain it. But the foam that's being used in the accused device here requires a facer, right? Well, there's two accused devices. One that does require a facer, the VT1, and then the VTX1 is made of the expanded polystyrene, which does not include a facer. So if you're using one of the preferred embodiments for the insulating material, yes, there has to be a facer, because otherwise it sprays and it foams and it gets out of control, but that facer is a byproduct of the manufacturing process. It's part of the insulating material. You can't get a board of polyisocyanurate without the facers. And in fact, that's how they order it now. The VT2 as sold today has the facers and then another layer of OSB followed by the blocks and the top layer of OSB. So it's our contention that when properly construed, the court found that the integral width language meant that the blocks were joined to the insulating material. In the prior art reference, the VT2, the use of the plywood there served the function of a facer? Arguably it did, but it's still our contention. It's a separate element. Just because you add polyisocyanurate to the board, it doesn't make the board part of the insulation. Would it have been anticipatory if it had used a felt facer in the prior art? Yes, I would agree with that. So I'm having trouble seeing how it would be anticipatory with a felt facer, but not anticipatory with a plywood facer. The felt facer doesn't do anything. It is part of the insulation material. I was trying to find a good analogy, and I don't know if I've done it, but it's kind of like looking at a cake with icing on it. I'm not going to look at that and say, if I put my hand on top of it, I'm not going to say, well, I'm touching the cake. Well, the icing's part of the cake. Okay, I knew this was a bad analogy, but the... I'll do a better one, and I'm sorry I'm messing it up. Did you pursue your cake analogy for just a minute? Where were you going with that? The icing is part of the cake, just like the facer is part of the insulation board. That is part of it. The OSB is actually a separate layer, and even Cornell, through their prior patent application, they tried to patent the VT2, an earlier version. It had strips instead of blocks, but otherwise it was the same. They were very clear and distinguished that the insulation was separate from the OSB. In that patent application, they were talking about a foaming polyisocyanate as well. Some icings are soft and sticky, and some icings are quite hard and crusty. Are you making a distinction between the sticky icings and the crusty icings? I've never seen a crusty icing, but I'll take your word for that. I am saying that the... I guess I am, because from what we've seen, and what Cornell's own documents prior to the litigation show, is that the OSB is a separate component in the product. It provides different characteristics and advantages to the end product that the facer doesn't. The facer does nothing. It's just part of the manufacturing process for the foam. But I thought you agreed that the plywood served as a facer in the prior art. Well, I agreed that they sprayed it against it. I still say and think that it's a different component. But you're distinguishing between a felt facer and a plywood facer. I think I'm trying to understand why there should be a difference between the two. Well, one doesn't provide anything to the invention. The felt facer, you end up with just a board of insulation. If you look at the polystyrene examples, there is no facer in the VT2X or the VT1X, because it's unnecessary. It's only there to make the foam. But the other layer of OSB is there to make this product, the end product, a maximum strength product for heavy roofing, slate tiles, etc. The facer doesn't serve any purpose. On top of that, I'd go back and one of the things that's in our materials is... But are you suggesting that if it serves the facer purpose, that it isn't prior art because it at the same time serves another purpose? I am saying I don't think it is. I think it is more than a facer. The insulation... Well, let me back up. I really think this shouldn't be a validity question. Really, the VT1 that we're accusing of infringement, which has the two facers, that's not prior art. There's no dispute about that. That should not have been part of the anticipation. Correct. And so... That's your point. Yeah. The claim language says the blocks are integral with or joined to the insulation material. Our argument is the insulation material includes the fiberglass or felt facers. If the court or the district court wants to say that the two are the same, then I think maybe that's an infringement issue. But I don't think it's an invalidity issue. You're still attaching that VT2 attaches the blocks to OSB and insulation below it. If the trial judge had been invited to or had actually conducted a full-scale obviousness analysis, how do you think the case would have come out in terms of the validity of your patent? Well, it's our position that there were secondary considerations of non-obviousness that would have carried the day for us. Obviously, everybody has to deal with KSI, which has made the burden on obviousness a little more difficult. Yes. As to whether these channels were... Sure. You would have had a tough sledding, wouldn't you? The art is close. I'm not denying that. But I think... And those issues aren't before the court right now. I mean, the evidence isn't here. But we did present secondary considerations of non-obviousness to the district court. And the district court then went on and found anticipation and then further said, because it's anticipated, it's obvious. Obviously, that's an issue. But I mean, I don't know if you want me to get into the secondary considerations. No. But I think they're there and they're substantial. And some of them come from Cornell themselves. I want to go ahead and move on to the other piece of art, the Branch River Airflow. Now, the Branch River, we think the district court erred in finding that it anticipates Claim 1 because it doesn't have interconnecting channels and it doesn't form blocks. The sole issue here is corroboration, right? Yes. The sole issue is corroboration. It is, although I think the district court and Cornell have argued that the brochure itself is a 102 reference, which we contend it's not. It has a reference in it to how the channels can be cut in either direction. And, well, either direction doesn't say both and doesn't teach or show the blocks. So I would agree. Our position is this is all about one witness who testified about the cross channels in that product. I think the testimony is pretty slim and I don't think it is clear and convincing evidence. Even the witness testified he can't be sure. But that testimony still requires corroboration. He wasn't sure that it happened. He wasn't sure about the date. And the date, as far as prior art, is critical. But I thought the date was identified by virtue of when he began work. Well, to say he, I think his testimony was it happened pretty soon after I started work. I can't be exact. I mean, I don't think that is clear and convincing evidence that that was done prior to the critical date. And on top of that, the only corroboration that Cornell or the court has pointed to is the airflow brochure. I thought you might have argued, isn't this whole thing on summary judgment? Well, it is, yes. I thought you might have argued that that certainly is a question of fact. And I'm sorry, I think I did that in the briefing. Yeah, I think you did in the brief. But there was an opportunity for you to make that point. I'll adopt the points that you made for me, thank you. But yeah, these are questions of fact that I don't think, that shouldn't have been made on summary judgment. I'll go ahead and if there's any other questions, there's a lot of time. All right. Mr. Schatz. May it please the court, counsel? Your Honors, we think the district court judge got it right here. And the patent in suit was not a complicated patent. And the prior art is not complicated prior art. The district court got it right because it looked at the VT-2, it looked at the VT-1, and it determined that there is no appreciable difference between these two products, at least in respect to the 9-5-0 patent. So when you look at claim one of the 9-5-0 patent, and you look at the specifications of the 9-5-0 patent, you see that polyisocyanurate is one of the preferred embodiments for the insulation layer. Polyisocyanurate, by nature, needs to be foamed between two surfaces. Cornell Corporation, back in the late 80s, was foaming polyisocyanurate directly onto a 7-16 inch wafer board. That was the top layer. The bottom layer was a felt facer. Now, in the early 90s, Cornell simply removed the wafer board and inserted a felt facer as the top layer, and that became the VT-1, the product that is accused here. Now, I heard a question about whether it was appropriate for the district court to look at the VT-1, this product that uses two felt facers as opposed to a felt facer on the bottom and a wafer board on top. I think it was appropriate because in any litigation, you have admissions being made by parties, you have positions being taken by parties, and arguments being made. There's no reason that the court needs to be blind to an admission, which is that the accused product, admission by older liable wholesale, the accused product is the VT-1, a product that has a felt facer on top and a felt facer on the bottom. I don't understand what the accused product has to do with this. There's a finding that in order to use this foam as was used in the prior art, you have to have a facer. A facer can be all sorts of things. In the particular prior art reference, it was pliable rather than felt, as it is in the accused product. I believe that's correct, Your Honor. The prior art product had felt facing. The prior art product had a wafer board, a 7-16, less than a half of an inch wafer board, between the spaced blocks and the insulating material. What the district court found is that old liable wholesale, the appellant in this case, was kind of stuck with the Markman claim construction that they advocated for. When they advocated, when we were talking about claims construction in this case, integral, as part of claim one, was integral therewith was construed by the court. And the court decided that the term integral was going to mean formed with or joined to. Now, if the court had decided that it just meant formed with, then ostensibly the spaced blocks and the insulating material would have to be made of the same thing. But in our products, the spaced blocks are wood, and the insulating material below is something else. And so what ORW did is they broadened how they asked the court to read integral and thereby included not only the accused product but also the prior art. And I think it's important to recognize that there aren't very many disagreements about what the VT-2 is or whether it's prior art. The only disagreement is how, as a matter of law, that claim one is applied to the undisputed facts. It's undisputed that the VT-2 had a thin wafer board layer between the spaced blocks and the insulating material. But as the court properly found at the district court level, that all became one board. These are boards that are manufactured this way. And as early as the late 1980s, Cornell was- Is that a question of fact as to whether it became one board? No, Your Honor, because it depends on the- It's a question of law, isn't it? It is, Your Honor. And it's based on the term integral, how that term was construed by the court. And it was properly decided by the court. This is not a question for a jury. This is clearly a question for a court to be decided at this stage. And Judge Dowd got it exactly right. He made the right decision by finding that you look at the VT-2, that's the patent, and it's anticipated and therefore invalid. I'd like to get to the Branch River Airflow, but before I do, I'd like to just point out that this court, I don't think, needs to reach that issue because if the patent is invalid, Claims 1, 2, 3, 6, and 7 are invalid, then the court doesn't need to get to the Branch River Airflow panel or the issue of corroboration or the distinction between Finnegan and Thompson. What about Claims 4 and 5? If you look at Claims 4 and 5, Claim 4 says the blocks have to be square. Claim 5 says the channels. Your problem is this. You didn't move for summary judgment as to the invalidity of 4 and 5. The district court gave you more than you asked for on summary judgment. How do you get around that? I'm not going to advocate strenuously on that point because I don't think it's a concern for us because our product doesn't have either one of those features. And I think it's pretty clear in the prior art that that was being done. If you look at the Cornell, the VT2, look back at the specifications, they got square blocks, but according to Cornell and according to the testimony in this case, it's better to have more airspace. So rather than having an equal distance between block, channel, block, channel, Cornell spread the blocks out so that there was more airflow underneath the surface, which is actually a better product. With regard to the Branch River airflow, I think the important point is that with regard to this piece of prior art, ORW's expert acknowledged that if it had cross-cut channels cut into it prior to the critical date, which is April 11, 1989, then it anticipates the patent claims. What we did then, obviously, is we went to the brochure, examined the brochure. We consulted with our expert. And then to resolve any dispute as to what the brochure actually said in providing channels in either direction, we went directly to Branch River in Rhode Island. We deposed one of their employees, not the owner of the company, just a guy who worked on the line. And he testified that he started there in July of 1986. And his deposition testimony is clear and convincing evidence that Branch River did this. It wasn't their bread-and-butter product, but they did it and they sold it well in advance of the critical date of April 11, 1989. That's a question of fact, too, isn't it, whether it was well in advance? We don't believe it is because the way it's characterized in the appellant's briefs is a testimony from Mr. Dufanese, who is this Branch River employee. He talks about, I asked him questions, you know, when's the last time you did this or when did you do this? Well, the last time was about 9, 10 years ago, the Rhode Island College Project. Can you tell us when exactly you did it? I don't know. I don't know when we did it. But when he was told, he doesn't need to give a specific date. You don't need to tell us the precise day of the week, the exact date. Then he kind of opened up and he said, oh, well, that's easier. I can tell you that I did it shortly after I started here in 1986. What's the critical date? The critical date is April 11, 1989. And what we did is we gave him… So you're saying that shortly means less than three years? Well, what he did is I followed up. I didn't want to leave it open like that, so what we did is follow it up. And he gave a broad estimate just to be on the safe side. So his shortly after he started in 1986 turned into at least within the first two years after I started here. That was a critical date in his life. He has no interest in this case. He testified as somebody for a company that's in Rhode Island. Our client is in Wisconsin. This was reliable testimony. Even if one concludes that no reasonable jury or juror could possibly disagree, what about the corroboration problem? As far as corroboration goes, I don't know that we need to navigate the waters of Finnegan and Thompson. Those cases are, I think, difficult cases for me. And I look at those cases, and I think we can get around dealing with those cases because what we have is a brochure that was sent to our client in 1987. It was sent from Branch River to Cornell in Wisconsin. And the brochure describes this product. And the product is the Branch River Airflow Panel. So, again, critical date, 1989. This is 1987. We get this brochure. The question about the brochure becomes, does the brochure disclose a panel that when placed on a roof, you have channels up the roof but also the possibility of cutting channels sideways in the roof? And your witness testifies that they have done this? Mr. Dufanese is not in the – I wouldn't say he's our witness, but I – Mr. Dufanese testified? Yes. He put to rest that issue. We put the brochure in front of him. What does this mean? That means both directions. So you're corroborating his testimony with the document that he's called upon to testify as to what it meant? Am I having trouble with that? I think, in essence, isn't – well, I think all corroborating evidence is, to some extent, circular because it agrees with some other piece of evidence. So what we have is a brochure that agrees with Mr. Dufanese's testimony, and Mr. Dufanese's testimony agrees with the brochure. It's consistent. And so when he testifies – Well, it seems to me the issue on corroboration is whether the oral testimony can add anything to the documentary evidence or whether the documentary evidence has to cover 100% of what you need to cover. That's the question. And I'm not sure that the cases say that there has to be 100% corroboration in the documentary evidence. That's not clear. And I think there isn't a 100% clear rule that this case falls within. But I think what we do have is we have consistency between a prior art brochure, a reference in the art, and we have testimony from somebody who actually did this, who was working on the manufacturing floor and was supervising some guys. And the way you do this is you run a piece of EPS or expanded polystyrene through a machine. It cuts ridges. The way you cut cross-sections is you turn it 90 degrees and you run it through the same machine again. Their expert testified that that was a simple process. Mr. Dufanese said it's a simple process. And the point of the Branch River Airflow panel as described in the brochure was that it's flexible. It can be modified for your project. Now, it's generally provided with ridges, but at times it's provided with cross-sections. And I think that's the limited issue. Let me go back for a second on the claims four and five. You said you didn't want to pursue them too vigorously because you don't. It doesn't matter a whole lot as a practical matter, right? But you're standing by your argument, right, that KSR would permit this kind of a ruling by the judge when it's such a de minimis difference between an asserted claim and a, in this case, a dependent claim or two. I would agree, and I think KSR stands for the proposition that if it's a minor change over the prior art. So somebody says, well, we have to limit the device to a certain size, which is exactly what this does. It's a square block. It's got to be equal distance apart. These are minor limitations that somebody of ordinary skill in the art would come across through ordinary experimentation. We would even submit that they aren't actually the best case scenario because what you want is you want more airspace below that top surface, not less. You believe there's no harm in the judge granting summary judgment even though somebody didn't think to ask it, right? No, Your Honor, and I think that it would be an academic exercise to send this back and let the judge make more findings and do more work where this is an anticipation case, but as the court recognized, I believe, earlier, that this case is clearly an obviousness case as well. So it could have been decided on either grounds. It was decided on the anticipation side, but the obviousness side is there, is completely there as well. To conclude, Your Honors, I'd ask the court. We don't use common sense in doing anticipation, do we? Well, as we argued under the shearing analysis, if a feature is inherent in the prior art, then there is some common sense in determining what that feature might be. I see that my time has expired. May I briefly conclude? Yeah, if you'd like to finish the answer. I think the point of it was a rhetorical question. Go ahead with your final comment. That's fine. Thank you very much. Thank you, Your Honors. Mr. Lomach. Your Honors, very briefly on Claims 4 and 5, there's nothing really to send back. I think our argument is that the district court didn't have subject matter jurisdiction over those claims because Cornell was seeking a declaratory judgment of invalidity. They weren't in dispute, so there was no subject matter jurisdiction. Well, I think that the counterclaims did cover Claims 4 and 5. You're not contending, are you, that if Claim 1 is anticipated that 4 and 5 aren't obvious? I'm not arguing that, no. I'm just simply arguing, I'm not agreeing that they're obvious, but I'm just arguing that there was no subject matter jurisdiction over those. We actually listed the specific claims in our complaint, and I don't recall whether their counterclaim was broader than that, but certainly they didn't move for summary judgment on those, and they weren't in dispute, and I don't think they were an issue in the case. But again, because we weren't asserting them, it's kind of a minor issue as well. Turning to the Branch River briefly, I don't know. ORW has argued that the document didn't go 100 percent, and we had some discussion just now on whether corroboration has to be 100 percent, and I honestly don't know the exact answer to that. But I know we have one document with one minor statement in it and one employee's testimony from 20-something years ago that is vague, and he even said, I can't be sure. And I don't think that just that is clear and convincing evidence that could be relied on to anticipate the claim. I mean, in this day and age, there should be all kinds of records, molds, all kinds of things to corroborate this, but we've got one piece of paper and one guy whose testimony is vague. I just don't think that is clear and convincing evidence. Back to the VT-2. I mean, the claim construction of integral is joined to, and I think the district court at one point even faulted ORW for not arguing that that meant indirect. But there was no reason to argue indirect. It's joined to the insulation. And again, I think it is a question of fact on whether or not the insulation with the facers is simply the insulation or it's more. Even Cornell's own MSDS sheets, when they talk about the makeup of the product, they say, well, it's made up of OSB and it's made up of polyisocyanurate insulation. And in their own MSDS, the material safety data sheet, we cite that. It says, well, the polyisocyanurate foam is made up of a cream-colored or white foam and the fiberglass facing. Outside of this litigation, they've always considered the foam, the polyisocyanurate, and the facing as the insulation. And that's, I'm out of time. Thank you. Thank you.